Elizabeth Smith and Valetta Atkinson v. Cornelius West Fitz-john, Appellant.—No. 39055.—188 S. W. (2d) 832.

Court en Banc, July 2, 1945.

138

*Whitney W. Potter* and *Conkling & Sprague* for appellant.

140

*Otto Imbersteg* and *O. E. Schultz* for respondents.

142

CLARK, C. J.—In a suit to contest the last will of Martha A. Fitzjohn, deceased, on allegations that she lacked mental capacity and had been unduly influenced, a jury returned a verdict upholding the will. The trial court sustained a motion for new trial on the ground it had erred in withdrawing the issue of undue influence and also in giving 'an instruction requested by proponent. Proponent appeals and contends that the instruction is correct, and also that there was insufficient evidence to justify the submission of either issue to the jury.

Testatrix died August 13, 1943, at the age of seventy-four. She wrote her own will. It was executed some time in the ▇▇▇▇ spring of 1943, the exact date being uncertain, but had been prepared by her a considerable time before that. She was a single woman, well educated, a stenographer and had at various times done court reporting. For many years she lived with her mother and two of her brothers. These two brothers died in 1942 and the mother died a few years before that. The will gave small bequests to two surviving sisters, the contestants, and the remainder of the estate, consisting of the home and some personalty, to her only surviving brother, the proponent-appellant.

For proponent there was abundant evidence that testatrix was intelligent, strong-minded and capable of managing her business affairs and that she did manage them successfully until three or four weeks prior to her death.

For contestants a number of lay witnesses gave opinions that testatrix was of unsound mind. Such an opinion by a lay witness is competent provided it is based upon facts furnishing a reasonable inference of mental unsoundness. Here the lay witnesses based their opinions on the fact that testatrix believed she was being watched or that someone was trying to get her property. If she so believed, without any reason, that might be some indication of mental unsoundness, but she seems to have had good reason for so believing. Witnesses for contestants testified that testatrix was watched by her sisters and other relatives and dates and places she visited were set down on paper and preserved by them. One of the contestants wrote a letter showing that she believed the testatrix had received more than her just share of the property of a deceased brother, and "if I had a little more proof of it I'd bring suit against her." Other trivial incidents were related, but a search of the record reveals no facts which support the opinions of the lay witnesses that testatrix was of unsound mind. If there was any evidence to justify the submission of that issue it must be found in the medical testimony introduced by contestants.

The testatrix was greatly shocked and grieved by the deaths of her two brothers. Her health failed early in 1943, and thereafter at various times she consulted with Dr. Dunsmore, a specialist in the treatment of mental and nervous diseases. The doctor testified

that he had known her over thirty years; that she was sound of mind in 1942; that she consulted him in 1943, on February 27, March 5, 15 and 26, April 16 and 23, May 14, 22 and 29, June 12 and 26, July 17, 18 and 19; that on February 27 he saw her at her home; on all the other dates to July 17 she called at his office; on July 19 she was placed in a small sanitarium and he saw her once or twice daily until her death on August 13; that she had a nervous condition with a good deal of mental disturbance connected with it and progressively got worse through the year; that she had no hallucinations until the last three and one-half weeks of her life. Then the doctor was asked as to her mental condition in the spring months of 1943 and definitely in April. He answered: ''I think she was of unsound mind, in 1943, *most of the time* after I saw her in February. Her mind was not normal.'' Then he was asked: ''Would you say at that time, that is, in the spring months *or* in April of 1943, that Martha Fitzjohn was mentally incompetent to comprehend and understand the nature and extent of all her property and reasonable claim of all persons who may have been naturally and reasonably within range of her bounty and to whom she desired to give her bounty and realized to whom she was giving her property without the aid of any other person? Would you say she was mentally competent to consider those matters?'' The doctor's answer was ''No.'' No objection was made to this testimony on the ground that it invaded the province of the jury.

On cross examination the doctor admitted that persons in the condition of testatrix would have ''remissions'' when ''they appear pretty well, but the underlying mental condition is still there.'' It was developed that during the time testatrix was under the doctor's treatment, that is, until she went to the sanitarium, she transacted her business, paid taxes, wrote letters, did some stenographic work, wrote a will for another woman and made a trip to see her brother in a distant part of the state. On this trip, which she made alone, it was necessary for her to change trains in Kansas City. Dr. Dunsmore admitted that all those acts were acts of sanity.

There can be no submissible issue of testamentary incapacity without some evidence of such incapacity *at the time* the will was executed. Evidence, not too remote, of mental unsoundness either before or after the will's execution is admissible, provided it indicates that such unsoundness existed at the time the will was made. [Schoenhoff v. Haering, 327 Mo. 837, 38 S. W. (2d) 1011; Whitacre v. Kelly, 345 Mo. 489, 134 S. W. (2d) 121; Hennings v. Hallar, 347 Mo. 827, 149 S. W. (2d) 338; Von de Veld v. Judy, 143 Mo. 348, 44 S. W. 1117.]

In the instant case the time of the will's execution is indefinite, with some probability that it was in April, 1943. Dr. Dunsmore testified to mental unsoundness of the testatrix from February 27 until her death, *most* of the time. Again, he said such unsoundness existed in the spring months of 1943 *or* in April. The statement that she was

mentally unsound *most* of the time carries with it the assumption that she was not mentally unsound *all* of the time. This is corroborated by the later testimony of the doctor that she had periods of "remission" during which she could, and actually did, perform acts requiring sanity. True, the doctor said that the underlying mental condition was still there, but, from such testimony, we cannot draw an inference that the testatrix was incapable of making a will at the indefinite date she made it, and a jury should not be permitted to draw such an inference.

We find no substantial evidence in the record to sustain the charge of undue influence. Testatrix was very fond of her brother, the appellant, to whom by will she gave the bulk of her property. She was interested in his home and on her visit there gave him a check for $400.00 to pay for a power lawn mower and some awnings. He was kind to her and invited her to live in his home as soon as she was able to leave the sanitarium. Most of the letters which went to testatrix from his home were written by his wife. He lived in St. Louis County and the testatrix lived across the state in St. Joseph, where he rarely went except to attend the funerals of relatives. He was not in St. Joseph when the will was executed, and there is nothing to show that he made any suggestion as to what the will should provide or even that a will should be made. The testimony, even that of contestants, was that testatrix transacted her own business, was not easily influenced and was determined to do things in her own way.

Appellant's instruction "C" which, in part, was the reason impelling the trial court to grant a new trial, after telling the jury in substance that the testator, if of sound mind, by her voluntary act might will more property to one relative than to another of equal degree without assigning a reason therefor, went on to say:

"The jury cannot substitute its judgment for the testatrix's judgment, nor should they determine or try to determine upon the wisdom or the justice of the disposition made by the testatrix of her property; whether such disposition is just or right is a question for the testatrix, and for none other than the testatrix."

We think this instruction incorrectly states the law and, if there is a submissible case on mental incapacity, constitutes reversible error. The testatrix, if of sound mind and under no compulsion, could favor one relative over another, but, if there was substantial evidence of mental unsoundness, the jury had the right to consider the justice or injustice of the will. [Schultz v. Schultz, 316 Mo. 728, 293 S. W. 105; Everly v. Everly, 297 Mo. 196, 249 S. W. 88; Stevens v. Meadows, 340 Mo. 252, 100 S. W. (2d) 281; Townsend v. Bank, 340 Mo. 550, 104 S. W. (2d) 657; Proffer v. Proffer, 342 Mo. 184, 114 S. W. (2d) 1035.]

Since in the instant case we conclude that there is no other substantial evidence of mental incapacity, we cannot reverse the case for error in instruction "C", unless the terms of the will alone constitute sub-

stantial evidence of such incapacity. In jury cases, appellate courts do not pass upon the *weight* of the evidence, but may determine whether there was *any* substantial evidence to submit to the jury on a given issue. A case might be imagined where the provisions of a will, without any other evidence, would be so unnatural or unreasonable as to make a submissible issue on mental capacity, but it would have to be an extreme case. So many things may reasonably induce a testator to favor one relative over others, such as the physical or mental condition of the recipient, his financial needs, gratitude for past favors or kindness, and a hundred other things which a testator may decide for himself without assigning a reason. In the instant case the testatrix favored a brother over her sisters. She was under no legal or moral obligation to support any of them. The testimony, even on behalf of contestants, indicates some friction between the testatrix and her sisters. Under such circumstances we must hold that the provisions of the will standing alone are not so unreasonable or unnatural as to furnish any evidence of mental incapacity. For discussion of the question ▮ see cases cited above and Kaechelen v. Barringer (Mo.), 19 S. W. (2d) l. c. 1037; Meier v. Buchter, 197 Mo. 68, 94 S. W. 883, 6 L. R. A. (N. S.) 202.

The order granting a new trial is hereby set aside and the cause remanded with direction to reinstate the judgment holding that the paper writing in question is the last will of Martha A. Fitzjohn, deceased. All concur.