JAMES EARL EVERLY, Appellant, v. JOHN B.
EVERLY, Executor of Will of JAMES M. EVER-
LY, and CHARLES HENRY EVERLY and JAMES
KERMIT EVERLY.

Division Two, February 23, 1923.

1. **WILL CONTEST:** Insane Delusion: Disinheritance of Plaintiff: Mat-
ter of Law.  If there are any facts upon which testator may have
reasonably based his belief that the plaintiff was not his child, it
may be ruled, as a matter of law, that his will, disinheriting plain-
tiff, was not the result of an insane delusion.  Returning home
five months before plaintiff was born and finding his wife in a
locked room with another man, and evidence produced at the trial
of a subsequent divorce suit, in which he charged her with unfaith-
fulness, from which a reasonable mind might conclude that she
was guilty, although the court adjudged her innocent, are facts,
if they were all the evidence, upon which the testator might rea-
sonably have based a belief that plaintiff was not his son, and to
justify a ruling that the provision disinheriting the son was not
the result of an insane delusion.  But as' there was other sub-
stantial evidence that for four years before their separation, on
the night he found her and the other man in the locked room,
testator labored under the delusion that other men were frequently
in the house at night and under their bed, that these phantoms
and this delusion came to him before he had any reason to suspect
his wife, that his assertion of her unfaithfulness prior to their

separation was not true, that such delusion persisted until his
will was made and that it influenced its provision relating to
plaintiff, a judgment upholding the will cannot be affirmed on the
theory that there was no evidence to support the charge that the
will was the result of an insane delusion.

2. ———: Invalid: Facts Establishing Insane Delusion. Where testa-
tor and his wife lived happily together for four years, her reputa-
tion was good and no account of her misconduct is shown to have
reached him until their separation, five months before plaintiff
was born, evidence that before the separation he had a delusion
about men coming into the house and being under their bed and
that he would arise a half dozen times a night to look in a closet
and under the bed for such. intruders, if true, no basis of fact
for the intrusion being shown, tends to establish his suspicion of
the wife's unfaithfulness to be an insane delusion; and if that
state of mind came to him before he had any reason for his sus-
picion, and remained with him until his will was made, and alone
influenced its provision disinheriting plaintiff, in the belief that
he was not his child, the will was invalid.

3. ———: ———: Unnatural Disposition: Instruction. An unnatural
or an unjust disposition of testator's property is material to the
issue of mental capacity; and an instruction for proponents telling
the jury that "it makes no difference what disposition he made
of his property, whether appropriate or not, or whether in your
opinion just," is erroneous, and the error is not cured by an in-
struction for plaintiff that "the jury, in determining the capacity
of the testator, may consider the will and all its provisions."

4. ———: Formal Execution: Instruction. An instruction for pro-.
ponents telling the jury that the paper writing in controversy was
"formally executed in conformity with the provisions of the law
relating to the execution of wills" is a correct statement of the
law, when applicable to the facts, and if contestants deem it like-
ly to be understood as embracing more than a mere formal execu-
tion, they should offer an instruction qualifying it and informing
the jury that a formal execution does not mean a valid execution,
nor embrace the issue of testator's capacity to make a will.

5. ———: Insane Delusion: Definition. An instruction which, after
correctly defining an insane delusion as the imagining of some-
thing to exist which had no existence, a belief springing from a
morbid condition of mind and one that can be accounted for on
no reasonable hypothesis, etc., proceeds to tell the jury that before
they can set aside the will in contest they must find that the
alleged delusion "was without facts of any kind to support it"
and "that the conception originated spontaneously in his mind and
was wholly without cause," is glaringly erroneous. Every effect

must have a cause, and this instruction in effect stated plaintiff's case out of court on the issue whether the will was the result of an insane delusion based on no rational ground for believing plaintiff was not testator's child.

6. ———: **Basis for Belief in Misconduct of Wife: Instruction: Disregard of Reports Received.** Where the issue in the will contest was whether the belief formed in testator's mind that the plaintiff was not his son had any basis of fact, and whether the provision of his will disinheriting plaintiff was the result of an insane delusion that his wife had been unfaithful, it was error to give an instruction for proponents telling the jury that "it makes no difference whether the plaintiff is or is not the son of testator" or "whether the evidence concerning acts and conduct of said wife, as shown by the evidence, be true or not" or "whether such acts and conduct were the result of her mental condition occasioned by her pregnancy at the time." It is not the law that it was only necessary for testator to receive reports of his wife's alleged misconduct, however unfounded or unreasonable; but it was pertinent to inquire, and for the jury to consider, what the facts were and what information of those facts was brought to the knowledge of the testator as the basis of his belief; and particularly so, where he lived in a rural community where everybody knew everybody else, and where a man of ordinary capacity and with ordinary information about what was going on in the community would be able to form a rational judgment of reports reaching him.

Appeal from Daviess Circuit Court.—*Hon. Arch. B. Davis,* Judge.

Reversed and remanded.

*Miles Elliott, M. E. Pangburn* and *Davis & Ashby* for appellant.

. (1) The evidence was clear and conclusive that the testator had an insane delusion on the subject of the paternity of his son. Under the law such delusion is presumed to have continued and to have existed at the time of the execution of said paper writing, when the contrary is not shown, as in this case. Said delusion controlled his mind at the very time he wrote the will, as he referred to appellant as being "'reputed to be my son.'" (a) A person may be perfectly sane upon all

subjects except one, yet if that one was present in the mind of the testator at the time of the execution of a will, and operated upon, controlled, and caused him to make it, which he otherwise would not have done, then such will would be void in the same degree as if the testator had been insane upon all subjects. Bounds v. Johnson, 192 S. W. 976. (b) Partial insanity renders a will null and void, if it can be inferred that the will is founded on such partial insanity. Benoist v. Murrin, 58 Mo. 324. (c) Where the delusion is as to the legitimacy of a child, and aversion towards the child follows, and the will disinherits the child, the probability and conclusion is that the will is the fruit of the delusion. People v. Hubert, 63 Am. St. 96, notes. (2) The court committed error in giving Instruction "2D" on behalf of respondent. Said instruction singled out and emphasized the testator's right to disinherit his son. Its effect was to mislead the jury into assuming that the justice or injustice of the will towards appellant had nothing to do with the issue on trial, and that his said son had no natural call upon his father's bounty, and took from the jury the circumstance that the appellant was disinherited, when such fact should have been considered by the jury as tending to prove whether or not the testator was possessed of an insane delusion. Gay v. Gilliland, 92 Mo. 264; Wendling v. Bowden, 252 Mo. 688; Mowry v. Norman, 223 Mo. 470; Meier v. Buchter, 197 Mo. 90; Hardenburgh v. Hardenburgh, 109 N. W. 1016; Bever v. Spangler, 93 Iowa, 576. (3) The court committed error in giving Instruction "3-D," on behalf of defendant, because said instruction is misleading and was understood by the jury that the will was a proper legal will; and being so understood, was in effect, a peremptory instruction to the jury to sustain the will. If the testator was laboring under the delusion that appellant was not his son, then the will was not "executed in conformity with the provisions of the law relating to the execution of wills," this because the law requires the execution of a will to be by one of sound mind.

Wigginton v. Rule, 275 Mo. 450. (4) Instruction "5-D" on behalf of defendant, does not properly define an insane delusion, and is so phrased that the jury was misguided and led to believe that if facts developed at any time during the life of said testator affording a real base for the delusion no delusion was proven, and the jury should so find, notwithstanding the fact that the evidence showed beyond any shadow of doubt that when said delusion was first formed and for several months thereafter, there was no justification for it whatever. It is not facts justifying the delusion known to the testator at the time he executes his will, but the want of facts upon which to form his belief is the true test. Said instruction is entirely silent about the facts at the time when the delusion was formed, but told the jury that if there was any evidence upon which to base the delusion, they could not find for appellant. Wiggington v. Rule, 275 Mo. 447. (5) Instruction "7-D" on behalf of respondent, tells the jury that it makes no difference whether the plaintiff is or is not the son of James M. Everly; second, whether the evidence concerning the act and conduct of the witness, Lilly M. Everly, as shown by the evidence in the case, be true or not; and, third, whether such act and conduct (if any) were the result of her mental condition occasioned by her pregnancy at the time. In said instruction following said three declarations the court told the jury that if the facts and conduct as shown by the evidence "came to the knowledge of James M. Everly, prior to the making of the will were of such a character as to form a base for his doubt whether the plaintiff was his son or not or his belief that the plaintiff was not his son, if such doubt was based thereon, then there was no delusion." (6) Where there is any evidence of testator's incapacity to make a valid will, whether it be of insanity or partial insanity, or an insane delusion, it is a question of fact, which should be submitted to the jury under proper instructions. Turner v. Anderson, 260 Mo. 16; Wendling v. Bowden, 252 Mo. 692; Teckenbrock v. McLaughlin, 209 Mo. 538; Mowry v. Norman, 204 Mo. 193.

Everly v. Everly.

(7) Whenever a person conceives something extravagant, which has in fact no existence whatever and is incapable of being reasoned out of this false belief, it constitutes insanity, and if this delusion relates to his property, he is incapable of making a will. Benoist v. Murrin, 58 Mo. 323; Knapp v. Trust Co., 199 Mo. 677; Buford v. Gruber, 223 Mo. 250; Holton v. Cochran, 208 Mo. 421; Heinbach v. Heinbach, 274 Mo. 301; Wigginton v. Rule, 275 Mo. 412; Seamen's Friends Society v. Hopper, 33 N. Y. 619.

*J. C. Wilson* and *Dudley & Brandom* for respondents.

(1) An insane delusion is a belief which has no basis in reason and cannot be dispelled by argument. 40 Cyc. 1013; Buford v. Gruber, 223 Mo. 231; Benoist v. Murrin, 58 Mo. 307. (2) A mistaken belief as to a matter of fact, or, an illogical conclusion, therefrom, is not an insane delusion. 40 Cyc. 1014; Fulton v. Freeland, 219 Mo. 494; Sayre v. Princeton University, 192 Mo. 95. Neither is any belief or prejudice, however mistaken, which has some basis for it. Fulton v. Freeland, 219 Mo. 494; Sayre v. Princeton University, 192 Mo. 95; 40 Cyc. 1014. (3) There can be no delusion based on facts. Prentiss v. Illinois Life Ins. Co., 225 S. W. 695; Buford v. Gruber, 223 Mo. 231; Benoist v. Murrin, 58 Mo. 307; Wigginton v. Rule, 275 Mo. 412; Fulton v. Freeland, 219 Mo. 517; Robinson v. Adams, 62 Me. 401, 16 Am. Rep. 473; Taylor v. McClintock, 87 Ark. 243; Slaughter v. Heath, 27 L. R. A. (N. S.), 68. (4) The mere fact that a parent disclaims paternity of children born of his marriage and disinherits them for that reason, carries no presumption of insane delusion. Morgan v. Morgan, 30 App. D. C. 436, 13 A. & E. Ann. Cases, 1037. A belief that a child is a bastard created by false testimony, or, induced by neighborhood gossip, although unfounded, is not an insane delusion. Morgan v. Morgan, supra; Re Smith, 24 N. Y. Supp. 928; Bennett's Est., 201 Pa. 485.

WHITE, J.—This suit is to be set aside the will of James M. Everly, deceased. The plaintiff is the reputed son of James M. Everly and Lilly M. Everly, his wife; and the defendants Charles Henry Everly and John Kermit Everly are the sons of James M. Everly by a subsequent marriage. James M. Everly died in 1914 leaving a will, the second clause of which is as follows:

"Second: I give, devise and bequeath to James Earl Everly, a son of my first wife reputed to be my son, the sum of five dollars only."

The testator then gives the remainder of his property to his second wife and their two sons, and made the second wife, Rosetta Everly, and his brother, John B. Everly, executors. Rosetta died before the testator, and John B., the brother qualified as executor.

The will was executed on the fourth day of October, 1910. The petition alleges that James M. Everly was not of sound mind at the time and states the following as his specific mental condition:

"That on the 4th day of October, 1910, and for a long time prior thereto, the said James M. Everly was subject to and labored under the insane delusion that his son, the plaintiff, was not his child, and that his first wife, Lilly M. Everly, the mother of plaintiff, was unfaithful to her marriage vow.

"That said pretended will was not executed by the said James M. Everly while he was of sound mind and disposing memory; but at the time of its execution and for a long time prior thereto he was mentally incapable of making a will and was devoid of testamentary capacity on account of said insane delusions; and that said insane delusions controlled his mind and induced him to sign said paper and thereby to attempt to disinherit this plaintiff."

For which reason it is prayed that the alleged will be declared void and of no effect:

James M. Everly and Lilly M. Weldon, the mother of the plaintiff, were married on the twelfth day of January, 1891. Everly was then twenty-three years of age and

his wife seventeen. They separated March 25, 1896, and plaintiff was born the September following. In June, 1896, after the separation, Everly filed a petition for divorce from his wife, alleging indignities which made his condition intolerable. In specifying the indignities the petition alleged that the plaintiff's wife was too familiar with one Clem White; that said White would write notes to her, that she would allow him to kiss her; that plaintiff arrived home on the twenty-fifth day of March, 1896, and found her locked in a room with White; that plaintiff then took her to her father's home. Lilly Everly also filed petition for divorce in which she alleged non-support. The court ordered the consolidation of the two cases and they were tried as one. On December 23, 1896, both petitions were dismissed, the court holding that neither party was able to make out a case.

A year later, in September, 1897, Lilly M. Everly filed another suit for divorce against her husband, alleging desertion and failure to support, asking the custody of their child, James Earl Everly, the plaintiff here, and for alimony. James M. Everly filed an answer and cross-bill, alleging the same matter as set forth in his petition for divorce in the first case. This was afterwards withdrawn and judgment rendered for the plaintiff Lilly M. Everly, the court adjudging that she was the innocent and injured party. A property settlement was shown by a contract, whereby the wife made a quitclaim deed to her husband affecting his real estate, and he paid her a thousand dollars.

James M. Everly afterwards married again, as stated, and by that marriage had the two children who are the defendants here. Lilly M. Everly married again, a man named Jordan, and appears as a witness for the plaintiff in this case.

To sustain the issues the plaintiff introduced evidence for the purpose of showing that James M. Everly labored under an insane delusion that the plaintiff was not his son, at the time of the execution of the will.

Lilly M. (Everly) Jordan, the mother of the plaintiff, testified in part as follows:

"Q. State what, if any, conduct or actions you observed in the demeanor of Mr. Everly during the time that you were living with him that attracted your attention to his mental condition as being out of the ordinary with reference to men coming there, or anything of that kind? A. Well, the last year we lived together I noticed it on him, and he would get up nights after we would go to bed and say, 'There is a man here,' and that 'he is under the bed,' and things like that, and look, and I would try to reason with Jimmie and tell him there was no man there, and he would say, 'Yes, there is a man there,' and he acted peculiar and wild about it; and in three or four months before we separated, after I became pregnant, I noticed it plainer on him than I did before I became pregnant; the last three or four months I noticed a great difference in him, but I noticed this difference in him during the last year we lived together."

This alleged eccentric conduct occurred shortly before the separation in March, 1896. After the separation, the plaintiff was born, September 1, 1896. He lived with his mother in the same neighborhood as James M. Everly, who apparently saw him often. He testified that in 1910, near the time when the will was executed, when he was about fourteen years of age, James M. Everly came to him and said:

"Boy, I have been wanting to talk to you alone, but have not had opportunity to find you by yourself. I have something on my mind which has been worrying me for a long time, no doubt you think I am your father and have not been treating you right. No doubt your mother has told you I am your father, but I am not. I do not know who your father is. So many would come into the house when we were living together and come into the room where we were and I would have to get up and run them out and get them out from under the bed."

The plaintiff then said his father broke down and cried and "shook all over." Plaintiff then asked Everly

why he didn't tell that when he had that trouble about the divorce suit, and states the answer thus: "He told me that he thought then that I was his child, and thought it all along until he got to studying about it, and he had thought and worried about it a lot, and the more he got to thinking about having to run people out of the room so much, and after having had several talks with his wife about it, he finally decided I was not his child."

Other witnesses testified to statements made by James M. Everly, indicating that he did not think the plaintiff was his child, and on such occasions he would be nervous and appear to be laboring under great excitement.

The defendants, in order to show that the belief in the mind of James M. Everly was founded upon information and facts, such as would account for the forming of such a belief by a reasonable person, offered in evidence the testimony taken on the trial of the divorce suit in 1896.

One Doctor Dorsey, whose deposition was taken at Keokuk, Iowa, testified that he had attended Lilly M. Everly in April, 1891, after her marriage in January of that year, and found her suffering from melancholia, what he termed a pregnant insanity. She required treatment at the time, and her condition of melancholia was due to her physical condition, caused by some congenital trouble. The physician thought it would be very hazardous for her to bear children. She had a miscarriage at the time of his treatment in April, 1891. He attended her again in April, 1894, and she was not normal at that time.

Other evidence produced at the trial of the divorce suit tended to show that on the night of the separation in March, 1896, James M. Everly having been away from home, returned and found his wife locked in a room with Clem White; that a quarrel ensued, and he took her to her father's home. On the way she asked him what would be done about the child that was expected (plaintiff was born a little more than five months later), and

he told her in effect that he would have nothing to do with it—that she could have it. There was evidence tending to show that on that same night Lilly hired a livery team and went to the house of Clem White; that she admitted that White had kissed her, but denied that anything more improper than that had, occurred. Some of the reproduced evidence tended to show that Lilly IM. Everly had been guilty of some indiscretions with other men during the time of her marriage to James M. Everly and before.

James M. Everly was in the court room and heard all the_testimony.

The plaintiff offered evidence to show that Lilly M. Weldon Everly was of good reputation in the neighborhood in which she lived, and no evidence was offered by defendant to show her reputation was bad.

The jury found that the paper writing under consideration was the will of James M. Everly. From that judgment the plaintiff appealed.

I.   The respondent claims the judgment should be affirmed because there is no sufficient evidence upon which the issue tendered by the petition might be submitted to the jury.   The case of Fulton v. Freeland, 219 Mo. 494, is similar to this in some of its aspects.   There the testator was of perfectly sound mind at the time of the execution of the will, except in one particular, in which it was claimed he was laboring under an insane delusion.   The court in that case held there was no evidence of an insane delusion, and said, at page 518:

**Insane Delusion: Question for Jury.**

"If there are any facts, however little evidential force they may possess, upon which the testator may in reason have based his belief, it will not be an insane delusion, though on a consideration of the facts themselves his belief may seem illogical and foundationless to the court; for a will, it is obvious, is not to be overturned merely because the testator has not reasoned correctly."

If the opinion formed in the mind of James M. Everly that his wife was unfaithful and that the plaintiff was not his son had been formed after he heard the evidence taken in the divorce suit, or after the somewhat convincing incidents which are said to have occurred when he came home in March and found his wife in a room with Clem White, it could be said of a certainty that there were some facts upon which to base his belief, and if that were all the evidence showed, the point made by the respondent would be well taken. While the trial court on the trial of the divorce case did not find the facts sufficient to warrant a decree of divorce in favor of Everly against his wife, there was suffcient evidence produced there from which a reasonable mind might reach the conclusion which Everly entertained.

But the evidence tends to show that during the four years in which Everly lived with his wife they got along well together and appeared to live happily. She denied the facts subsequently developed, according to defendant's evidence, showing misconduct which came to the attention of Everly. There was evidence that her reputation at that time was of the best, and no account of any misconduct on her part is shown to have reached him until the night of the separation. Before the separation she testified he had a delusion about men coming in the house and being under the bed; that he would get up a half dozen times in the night to look in the closet and under the bed to see whether someone was there. That evidence tends to show that his suspicion then was an insane delusion. No basis in fact is shown for it. If that state of mind came to him at a time before he had any reason for suspicion and remained with him until he made his will, and alone influenced the provision regarding the plaintiff, then the will was not valid.

Her evidence in that particular was to some extent corroborated by that of the plaintiff, who testified that Everly came to him in 1910, near the time the will was executed, and told plaintiff of his doubts about plaintiff's paternity, because so many would come into the house and

into the room where he and his wife were and he *would have to get up and run them out from under the bed.* The witness continued: ''He told me that he thought I was his child, and *thought it all along until he got to studying about it, and thought and worried about it a lot, and that the more he would study and think about it and about having to run people out of the room,* and after having had several talks with his wife about it, he had decided that I was not his child.''

This evidence indicates that the so-called delusion was the result of meditation after the testator had become aware of facts upon which to base it, but the testator, as a reason for his conclusion, refers to the phantom incidents of fourteen years before as related by his wife; incidents indicating an insane delusion which appeared to be an active influence at the time of his interview with his reputed son.

While the evidence shows suffcient facts upon which the testator might have reached the conclusion which he did about the plaintiff, without being influenced by an insane delusion at the time he made his will, yet there is *some* evidence, as indicated, that he entertained that idea before there was any reason for it, and the *same* delusion remained with him until the will was made.

The opinion of this court in the case of Wigginton v. Rule, 275 Mo. l. c. 447, quotes from a Nebraska case to the effect that ''no belief that has any evidence for its basis is in law an insane delusion,'' and comments on it, as follows: ''But the word 'evidence' in the foregoing definition has reference to the evidence which the testator may have had before him *at the time he formed the belief.* It cannot have reference to the evidence which may be *offered upon the trial of the case.*''

The court then stated the question to be determined by the jury as follows: ''Did the testator have before him evidence acting upon which any normal or rational mind would have formed such a belief?''

We think the evidence was sufficient to submit the issue to the jury as to whether that delusion, if it was

such, continued with him and influenced him in the making of the will.

II.   Complaint is made of Instruction numbered 2-D, given on behalf of the defendant:

"James M. Everly, if of sound mind as defined in these instructions, had the right to dispose of his property by will as he chose; this is the lawful right of every person possessed of sufficient mental capacity to make a valid will, even to the exclusion of those who, but for the will, would have been heirs to his estate; so it makes no difference what disposition he made of his property, whether appropriate or not, or whether in your opinion just.   You have only to consider whether the paper writing produced as his will, be, or be not his will."

*Unnatural Will: Testamentary Capacity.*

It is argued by respondent that an unnatural or an unjust disposition of property is not material to the issue of mental capacity, but would only be material where the issue was of undue influence.

The question of mental capacity involves whether the testator's mind was in such condition that he recognized his obligation to the objects of his bounty and their relation to him.   Undoubtedly a very unjust disposition of his property, a disposition which would disinherit a deserving child, would be some indication of failure to understand his obligation to the child.   This court, in the recent case of Ray v. Walker, 293 Mo. l. c. 468, in a consideration of the question of undue influence and *testamentary capacity* and the relation to the testator of the objects of his bounty, said:   "The provisions of the will, its recitations and all the environments and circumstances of the case are to be considered by the jury."

The court quoted from Schouler on Wills, in Meier v.Buchter, 197 Mo. l. c. 89:   "But in order to sustain any unjust, unnatural, or absurd will, which may be contested, fair proof at least should be afforded that the testator was of *sufficient capacity* at the date of execu-

297 Mo.—14

tion *to comprehend its import*. . . . In fine, a harsh and unnatural disposition by the will in question, *is a circumstance which tends to discredit the maker's testamentary capacity.*"

On these authorities we think the instruction given was erroneous.

The respondent, however, calls attention to an instruction on behalf of the plaintiff which says that the jury, in determining the capacity of the testator, may consider "the will itself and all its provisions," and argues that it cures the error in giving Instruction 2-D.

That general statement allows the jury to do what they naturally would do without an instruction. It does not correct the specific direction that it made no difference what was the disposition of the property. The jury were allowed to consider all the will but were admonished that they were not to consider that feature of it. The error in giving Instruction 2-D was not cured.

III. Appellant complains of an instruction telling the jury that the paper writing in controversy was "formally executed in conformity with the provisions of the law relating to the execution of wills."

**Formal and Valid Execution.**

That is a correct statement of the law applicable to the facts, and if it was likely to be understood by the jury to embrace more than mere formal execution and to include a valid execution by a person of sane mind, the plaintiff should have offered an instruction qualifying that instruction by informing the jury that a formal execution didn't mean the valid execution, because the matter in issue was whether the testator was capable of executing a will.

IV. Several instructions were given on behalf of the defendant defining and explaining an insane delusion as the imagining of something to exist which really had no existence; a belief springing from a morbid condition of the mind—one that could be accounted for on no

reasonable hypothesis; and other expressions of that character, which definitions are supported by the authorities. These instructions then went further and told the jury that before they could set aside the will they must find the alleged delusion "was without *facts of any kind to support it.*" "That the conception originated spontaneously in his mind and was *wholly without cause.*"

To say that any effect is without a cause is to state an impossibility. Every effect must have a cause. The delusion may have been caused by a dream, by a diseased condition of the testator's mind, or by any number of things entirely foreign to things which he believed, and still it would not be without cause. That particular declaration states the plaintiff's case out of court.

Neither is it correct to say "that it must be without facts of *any kind* to support it." The rule laid down in several of the pertinent and leading cases is not stated so strongly as that. It was said in the case of Fulton v. Freeland, in opinion by GRAVES, J., 219 Mo. at page 517: "If the idea entertained has for a basis anything substantial it is not a delusion."

In the case of Knapp v. Trust Company, 199 Mo. l. c. 668, GANTT, J., quotes from a text-book this explanation: "To invalidate a will it must appear that the testator was subject to a delusion as to facts within his own observation, in the existence of which he actually believed, *which a rational man, from the use of his senses, under the same circumstances, would have known not to exist.*" That statement is quoted approvingly in Wigginton v. Rule, 275 Mo. l. c. 446.

In order then to constitute an insane delusion it must have no basis in facts which would induce belief in a rational mind. There may be facts which would create the delusion in a diseased mind, or in a jealous mind which had become morbid by dwelling upon imaginary wrongs. Suppose the testator had read or heard about unfaithful wives, and had pondered over matters of that kind until some slight circumstance would induce a belief of unfaithfulness on the part of his wife when such

circumstances would not have conveyed any such belief to a normal rational mind. It is not a belief formed in an entire absence of facts, but a belief formed in the absence of any facts which would bring a conviction to a rational mind, that determines whether or not the belief is an insane delusion. That instruction overstates what it was necessary to prove in order to establish an insane delusion, and placed an undue burden upon plaintiff.

V. Another instruction, numbered 7-D, given on behalf of defendant, contains the following:

"It makes no difference:

"1. Whether the plaintiff is or is not the son of James M. Everly;

"2. Whether the evidence concerning acts and conduct of the witness, Lillie M. Everly, as shown by the evidence in the case be true or not;

"3. Whether such acts and conduct (if any) were the result of her mental condition occasioned by her pregnancy at the time."

The very issue in the case is whether or not the belief formed in the mind of James M. Everly that the plaintiff was not his son, had any basis in fact. It was pertinent to inquire what the facts were and what information of those facts was brought to the knowledge of the testator as the basis of his belief. It will not do to say that it was only necessary for him to receive reports of the alleged misconduct, however unfounded or unreasonable. The testator lived in a rural community where everybody knew everybody else, where a man of ordinary capacity and with ordinary information about what is going on in the community would be able to form a rational judgment of reports which reached him. That such alleged misconduct in fact took place under the circumstances detailed would be some evidence that it could and did come to his knowledge. If such reports of misconduct were baseless, with the opportunities which Everly had for ascertaining the truth, such circumstances

*Basis for Belief in Misconduct of Wife.*

should have some weight with the jury in determining whether a rational mind would reach such conclusion.

For the errors mentioned in the giving of instructions the judgment is reversed and the cause remanded. All concur.